IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AGNIESZKA P.,

                     Claimant,

        v.

MARTIN O'MALLEY, Acting
Commissioner of Social Security,

                  Respondent.

No. 21 CV 1433

Magistrate Judge Jeffrey T. Gilbert

**MEMORANDUM OPINION AND ORDER**

Claimant Agnieszka P.[1] ("Claimant") seeks review of the final decision of Respondent Kilolo Kijakazi,[2] Acting Commissioner of Social Security ("Commissioner"), denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties consented to the exercise of jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 8]. This Court, therefore, has jurisdiction pursuant to 42 U.S.C. § 405(g). The parties respectively filed motions for remand or summary judgment. *See* [ECF Nos. 17, 19, 25]. This matter is fully briefed and ripe for decision.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Martin O'Malley became the Acting Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Acting Commissioner O'Malley as the named defendant.

For the reasons discussed in this Memorandum Opinion and Order, Claimant's Motion to reverse or remand the Decision of the Commissioner of Social Security [ECF Nos. 17, 19] ("Motion") is granted, and the Commissioner's Motion for Summary Judgment [ECF No. 25] is denied.

## PROCEDURAL HISTORY

On May 8, 2019, Claimant filed a Title II application for a period of disability and disability insurance benefits. (R.15). In her application, Claimant alleged a disability beginning on February 3, 2019. (R.15). The application was denied initially on August 23, 2019, and again on reconsideration on February 25, 2020, after which Claimant requested a hearing before an administrative law judge ("ALJ"). (R.15). On November 12, 2020, Claimant appeared telephonically and testified at a hearing before ALJ Lee Lewin. (R.15). Claimant was represented by counsel at the hearing. (R.15). During the hearing, the ALJ also heard telephonic testimony from Dr. Michael Carney, a medical expert, and Susan Entenberg, a vocational expert. (R.15).

On November 20, 2020, the ALJ issued a decision denying Claimant's application for a period of disability and disability insurance benefits. (R.15-24). The ALJ followed the five-step evaluation process required by the Social Security Regulations to determine if an individual is disabled. *See* 20 C.F.R. § 416.920(a). At step one, the ALJ noted Claimant had engaged in post-disability onset work activity, but concluded it fell below the level of substantial gainful activity. (R.17). At step two, the ALJ found that Claimant had the following severe impairments: major depression, general anxiety, and attention deficit hyperactivity disorder. (R.17).

At step three, the ALJ found that although Claimant has severe impairments, these impairments did not individually or in combination meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)). (R.17-18). The ALJ also found Claimant's mental impairments, considered singly and in combination, did not meet or equal the criteria of listings 12.04 and 12.06. (R.18). In making that finding, the ALJ considered and concluded that Claimant did not meet the paragraph B criteria of at least two "marked" limitations or one "extreme" limitation. The ALJ concluded Claimant had mild limitations in understanding, remembering and applying information, and in concentrating, persisting or maintaining pace, and moderate limitations in interacting with others and in adapting or managing oneself. (R.18). The ALJ also recited the requirements of "paragraph C" criteria and although the ALJ did not directly address whether Claimant satisfied those criteria, the ALJ proceeded to step four, suggesting the ALJ did not find the paragraph C criteria to have been satisfied. (R.18-19).

Before proceeding from step three to step four, the ALJ assessed Claimant's residual functional capacity ("RFC"). (R.18-19). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The ALJ concluded:

> "the claimant has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: she can work at all exertional levels; understand, remember and carry out instructions for simple, routine, repetitive tasks with sufficient persistence, concentration or pace to timely and appropriately complete such tasks; have occasional contact with co-workers, supervisors and the

general public; can adjust to routine workplace changes, but perform no fast paced production rate, pace or strict quota requirements; perform no group or tandem team work; and, no problem solving tasks with the general public."

(R.18-19). At step four, the ALJ determined that Claimant had past relevant work as an office clerk, loan processor, legal assistant, liquor store worker, and in food delivery. (R.22). However, the ALJ concluded Claimant was unable to perform past relevant work given the limitations of Claimant's RFC. (R.22). At step five, the ALJ considered Claimant's age, education, work experience, and residual functional capacity, and found there are jobs that existed in significant numbers in the national economy that Claimant can perform based on the testimony of the vocational expert (janitor, hospital cleaner, and hotel housekeeper). (R.23). For all these reasons, the ALJ found Claimant has not been under a disability, as defined in the Social Security Act, since February 3, 2019, the alleged onset date, to the date of the opinion. (R.24).

The Appeals Council declined to review the matter on January 11, 2021, making the ALJ's decision the final decision of the Commissioner. (R.1-6). Therefore, this Court now has jurisdiction to review this matter. 42 U.S.C. § 405(g); *Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

When a claimant files an application for disability benefits, he or she bears the burden under the Social Security Act of bringing forth evidence that proves his or her impairments are so severe that they prevent the performance of any substantial gainful activity. 42 U.S.C. § 423(d)(5)(A); *see Bowen v. Yuckert*, 482 U.S. 137, 147–48

(1987) (citing 42 U.S.C. § 423(d)(1)(A)). A five-step inquiry controls whether an individual is eligible for disability benefits under the Social Security Act, which the Seventh Circuit has summarized as follows:

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Butler v. Kijakazi,* 4 F.4th 498, 501 (7th Cir. 2021) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); 20 C.F.R. §§ 404.1520, 416.920). Claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Gedatus v. Saul,* 994 F.3d 893, 898 (7th Cir. 2021); *Wilder v. Kijakazi,* 22 F.4th 644 (7th Cir. 2022).

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotations omitted); *see also* 42 U.S.C. § 405(g); *Fowlkes v. Kijakazi*, 2021 WL 5191346, at *2 (7th Cir. 2021). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. Even when there is adequate evidence in the record to support the ALJ's decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the ALJ's decision lacks evidentiary support

or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before deciding whether to affirm the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *see also Gribben v. Kijakazi,* 2022 WL 59404, at *2 (7th Cir. 2022) ("We do not reweigh the evidence or resolve conflicts in it.").

## ANALYSIS

Claimant argues the ALJ's decision cannot stand because: (1) the ALJ's reliance on the vocational expert's estimation of available jobs in the national economy that Claimant could perform was not supported by substantial evidence; (2) the ALJ failed to consider Claimant's post-hearing objections to the vocational expert's testimony; and (3) the ALJ erred in discounting Claimant's subjective mental health symptoms. [ECF No. 19]. For the reasons discussed below, the Court finds the ALJ's reliance on the vocational expert's job estimates was not supported by substantial evidence. As this error requires remand on this record, the Court will not address Claimant's remaining arguments.[3]

---

[3] The Court notes that while the Commissioner obtained leave of Court to file a Surreply brief, [ECF No. 28], Claimant did not seek leave to submit her second Reply Brief, which appears to primarily address arguments that had been previously raised in the

I.  **The ALJ's Reliance On The Vocational Expert's Testimony Estimating Available Job Numbers Was Not Supported By Substantial Evidence**

Claimant argues the ALJ improperly relied on the vocational expert's ("VE") testimony regarding the estimated number of jobs available to Claimant in the national economy because the testimony did not satisfy the substantial evidence standard for reliability. [ECF No. 19] at 3-11. Claimant asserts the expert relied on "blanket use of the SkillTRAN program" and "used none of her own experience as a job expert." [ECF No. 19] at 4. Claimant also argues the expert could not explain how the SkillTRAN source calculated job estimates. [*Id.*]

At step five, the burden shifts from the Claimant to the Commissioner to demonstrate that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations. *Gedatus*, 994 F.3d at 898. In a 2022 per curium opinion, the Seventh Circuit held "when a claimant challenges a vocational expert's job-number estimate, the ALJ must inquire whether the methodology used by the expert is reliable." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) ("Administrative law judges often rely on vocational experts to estimate these job numbers. But ALJs cannot afford complete discretion to vocational experts."). "[S]ubstantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology," *Ruenger*, 23 F.4th at 763, meaning it is based on "well-accepted" sources and the VE explains his or her

Commissioner's Memorandum in Support of Motion for Summary Judgment. [ECF No. 31]. Accordingly, the Court does not rely on Claimant's additional brief.

methodology "cogently and thoroughly." *Biestek*, 139 S. Ct. at 1155. This "is not a high threshold" and "requires only enough 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *See Case v. Kijakazi*, 2023 WL 4882880, at *3–4 (7th Cir. Aug. 1, 2023) (quoting *Biestek*, 139 S. Ct. at 1154). "Thus, the expert's explanation of the methodology that he used to produce his estimate must be 'reasoned and principled' enough to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Id.*

At Claimant's hearing, the vocational expert ("VE") testified that an individual with the RFC described by the ALJ would be able perform jobs at the medium exertional level (such as janitor and hospital cleaner) and at the light exertional level (such as hotel housekeeper), and identified the estimated numbers of such jobs in the national economy. (R.23; R.78-79). The VE also testified, based on her education, training and experience, that an individual who was off-task more than 15% of the workday or missed two or more days of work a month, would not be able find any competitive work. (R.79).

On cross-examination by Claimant's counsel, the VE stated the sole source for her job number estimates was "SkillTRAN Job Browser Pro, DOT employment estimates 2019." (R.82); *see also* R.89-90 (answering "no" in response to whether VE performed any additional, unique steps to SkillTRAN's job numbers). Upon further examination by the ALJ, the VE described her process for obtaining the job estimate numbers as follows: in the SkillTRAN software, the VE goes "to the DOT number [for a hotel housekeeper]," clicks on "a variant in there for employment numbers," selects

"a tab for DOT employment estimate as opposed to OES," clicks "full-time," and "it gives me an estimate" for hotel housekeeper jobs. (R.84-85). When asked to describe SkillTRAN's methodology, the VE read a description from the SkillTRAN website. (R.86-87). The VE also confirmed that she selected the occupations that she inserted into SkillTRAN's program, presumably based on her experience and training, although she did not testify to this expressly. (R.85).

The VE explained SkillTRAN's methodology was reliable because it has been peer reviewed and is considered an acceptable source in the vocational rehabilitation field. (R.90). The VE said SkillTRAN "look[s] at user input" and "SkillTRAN's constantly revising individuals within the vocational field are inputting them with their information on jobs to be looking at [*sic*] – not looking at just taking the total number and dividing it by how many occupations fall into that OES category." (R.90-91). The VE did not identify any peer-reviewed literature addressing SkillTRAN and when pressed on cross-examination as to why she relied on SkillTRAN job numbers in this case, the VE stated "[b]ecause I choose to rely on it [as] an accepted resource, and it has been accepted by – as I understand – by Social Security for giving information on jobs and looking at numbers and looking at projections, et cetera, et cetera." (R.91). She went on to state "[o]thers can choose to do what they want, but that's what I choose" and "[m]y understanding is that it is an accepted source within Social Security. I could be wrong on that but that was my understanding." (R.91-92). At the close of the VE's testimony, the Claimant's attorney objected to the VE's job number estimates, stating "I don't think that the testimony substantiates

SkillTRAN's reliability." (R.92). Claimant also submitted a post-hearing brief describing objections to the VE's testimony. (R.447-57).

In considering a vocational expert's reliance on SkillTRAN job numbers, "the issue is 'not whether SkillTRAN is reliable as a matter of law, but rather whether the VE's testimony in this case, drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden.'" *Michelle S. v. Kijakazi*, 2022 WL 4551967, at *6 (N.D. Ill. Sept. 29, 2022) (Gilbert, J.) (citing *Dunn v. Kijakazi*, 2021 WL 5105169, at *12 (E.D. Wis. 2021) and *Bruno v. Saul*, 817 Fed. Appx. 238, 243 (7th Cir. 2020)). The Seventh Circuit's recent analysis of a vocational expert's acceptable methodology using SkillTRAN for job number estimates in *Case v. Kijakazi* illustrates the shortcomings of the VE's explanation of her methodology in this case. *See* 2023 WL 4882880, at *3–4 (7th Cir. Aug. 1, 2023).

In *Case*, the Seventh Circuit explained "[t]he inability of the vocational expert to precisely explain the [SkillTRAN] software's algorithms does not render his explanation unreliable," although the Court agreed "the expert could have explained the SkillTRAN methodology more clearly." *Id.* (internal citations omitted). Rather, the Court determined that the ALJ's acceptance of the expert's methodology was supported by substantial evidence because "the ALJ conducted a deeper inquiry into the vocational expert's methodology before relying on it" including determining that the estimates "were not only the product of the software, but also of [the VE's] experience providing job counseling, his prior research, and his observations of the jobs in question." *Id.* The ALJ in *Case* solicited information about the expert's

personal experience with SkillTRAN, including that the software produced "consistent data year over year and that he has personally observed and researched these job categories through four decades of placing workers in jobs." *Id.* Based on this "deeper inquiry", the Seventh Circuit concluded "[t]he ALJ was entitled to conclude that both the expert's use of the software and his prior research and professional experience produced sufficiently reliable estimates." *Id.*[4]

By contrast, the ALJ here did not engage in much, if any, inquiry at all about the VE's methodology. The VE testified that she relied on SkillTRAN job estimate numbers without modification or adjustment and recited a description from SkillTRAN's website to explain its methodology. (R.86-87, R.89.) The ALJ failed to follow-up or probe for any additional explanation of the VE's methodology. Instead, when Claimant's counsel said he wanted further explanation, the ALJ suggested

---

[4] In support of the ALJ's rejection of Claimant's challenges to the VE's testimony in this case, the ALJ noted the Supreme Court had "expressly rejected the Seventh Circuit line of cases and reasoning that preceded" the *Biestek* decision, which the ALJ characterized as "the case law underlying [claimant's] argument." (R.24). In *Biestek*, the Supreme Court rejected "the Seventh Circuit['s] . . . categorical rule . . . precluding a vocational expert's testimony from qualifying as substantial if the expert had declined an applicant's request to provide supporting data." *Id.*, 139 S. Ct. at 1153–54. The Court disagrees that Claimant's argument is premised on application of a categorical rule. As the Supreme Court acknowledged, a claimant "may probe the strength of testimony by asking an expert about . . . her sources and methods—where she got the information at issue *and how she analyzed it and derived her conclusions.*" *Id.* at 1156 (emphasis added). Similarly, in decisions issued after *Biestek*, the Seventh Circuit has held an ALJ must make further inquiry when a vocational expert's methodology has been challenged to ensure the expert's job estimates are the product of a reliable methodology. *Ruenger*, 23 F.4th at 761; *Case*, 2023 WL 4882880, at *3–4. To be clear, the Court is not applying any categorical rule related to an expert's refusal to provide supporting data; rather, the Court's decision under the circumstances of this case is based on the ALJ's failure to establish whether the expert's methodology of relying on job number estimates from the SkillTRAN source without further analysis or anything else was reliable.

counsel "read [the SkillTRAN website] again if you need to understand it any further." (R.87-88.)[5]

In this context, the expert's mere recitation from the SkillTRAN website did not provide substantial evidence that her methodology (to entirely rely on SkillTRAN estimates) was reliable. *See Jonathan W. v. Kijakazi*, 2023 WL 5748363, at *3–6 (N.D. Ill. Sept. 6, 2023) (rejecting Commissioner's argument "that SkillTRAN publicly posts its methodology online and that the VE understood this methodology" because "this alone does not otherwise support that the VE utilized a reliable methodology" where "[n]ot only did the VE fail to explain her methodology, such that the ALJ could evaluate it, but the ALJ also did not evaluate the methodology SkillTRAN posted on their website"); *Staples v. Kijakazi*, 2023 WL 2753855, at *4-5 (W.D. Wis. Apr. 3, 2023) (ALJ failed to "ensure that the VE's job estimates were the product of a reliable methodology" where ALJ relied on expert's statement that SkillTRAN's Job Browser Pro "methodology was publicly available on the developer's website" and did not "actually evaluate the methodology described on the website"). In short, the ALJ did not sufficiently explore the expert's methodology of relying on SkillTRAN's job number estimates. The sum and substance of the VE's testimony was that this is

---

[5] For this reason, the Court views the ALJ's assertion that Claimant's counsel "did not take the opportunity of cross-examination to assist his comprehension" of the VE's methodology to be unsupported. (R.23). Moreover, the ALJ's statement disregards the independent obligation of an ALJ to further inquire as to the reliability of an expert's methodology where it has been challenged. *Ruenger*, 23 F.4th at 761; *Case*, 2023 WL 4882880, at *3–4.

what SkillTRAN says, and I understand that is reliable and has been accepted in the past by the Social Security Administration.[6]

Nor did the ALJ inquire as to the VE's methodology of relying *exclusively* on SkillTRAN's numbers. When the expert clarified that she did not perform any steps to modify SkillTRAN's estimates, the ALJ did not engage in any further inquiry. (R.89-90). *Compare Case*, 2023 WL 4882880, at *3–4; *Tipsord v. Kijakazi*, 2023 WL 6276489, at *5–7 (C.D. Ill. Sept. 26, 2023) (ALJ "conducted an in-depth inquiry into the VE's methodology before relying on it," satisfying the substantial evidence standard by ascertaining that expert's "estimates were not only the product of SkillTran, but also of her prior labor market research and her 25 years of experience placing individuals with limitations in the workforce" using "her education and professional experience to further reduce the job estimates to include" limitations "SkillTran does not address" such as "contact with coworkers or the public"); *Michelle S.*, 2022 WL 4551967, at *6 (Gilbert, J.) (after Claimant's counsel challenged job number estimates, "ALJ fulfilled her duty at step five to ensure the VE used a reliable, well-accepted methodology" by sending detailed interrogatories to VE and convening a supplemental hearing for further questioning). Absent meaningful inquiry, the ALJ did not establish – nor can this Court confirm – that substantial evidence supported the expert's methodology.

---

[6] The Court notes the ALJ's opinion says the VE "did not rely exclusively on Skilltran" (R.24), but the ALJ provides no citation in support of that hypothesis, and the hearing transcript makes clear the expert did, in fact, rely exclusively on the SkillTRAN estimates and did not adjust or probe them in any way. (R.82, R.89-90.)

Moreover, unlike in *Case*, where the VE "explained that SkillTRAN produces consistent data year over year and that he has personally observed and researched these job categories through four decades of placing workers in jobs," the expert here did not articulate why her methodology is generally considered reliable by vocational experts. While the VE testified that SkillTRAN is considered "an acceptable source" in her field, she did not explain whether or why her methodology of relying on SkillTRAN's estimates without additional analysis or adjustment is reliable. (R.90; *see also* R.91-92 ("Others can chose to do what they want, but that's what I choose.") In addition, when cross-examined as to the basis for the VE's testimony that SkillTRAN is an accepted source (including whether the VE was claiming the Social Security Administration had administratively noticed it as acceptable or that other judges had accepted her testimony), the VE testified "No, no, no. My understanding is that it is an accepted source within Social Security. I could be wrong on that but that was my understanding." (R.92). The ALJ also did not further inquire about this testimony. For these reasons, the VE's testimony about SkillTRAN's reliability is not analogous to other cases where the VEs favorably analyzed SkillTRAN estimates in light of their personal job knowledge gleaned from years of experience.

The Commissioner cites *Wilhelm v. Berryhill*, 2017 WL 5248285, at *7 (N.D. Ind. Nov. 13, 2017) for the proposition that "there is no legal requirement that the ALJ, or the vocational expert, explain the methodology used by SkillTRAN" and "it was sufficient that the vocational expert provided the source of his numbers, namely SkillTRAN, which is publicly available labor market software." [ECF No. 25] at 8.

This argument conflates whether SkillTRAN is an accepted source with whether the VE's methodology of relying (exclusively) on estimates generated from that source in a particular case was reliable. The Commissioner's cited cases acknowledge that while SkillTRAN may be an acceptable source, it might not be a reliable methodology for a VE to rely solely on SkillTRAN estimates without some further analysis based on the expert's experience, expertise, or comparison with other sources. [ECF No. 25] at 8-9 (citing *Pendone v. Berryhill*, 2018 WL 460063, at *7 (D. Colo. Jan. 18, 2018)). In other words, "the mere fact that SkillTRAN was used is not itself substantial evidence of reliability." *Eidenier v. Kijakazi*, 2022 WL 179060, at *8 (N.D. Ind. Jan. 19, 2022); *Wilcox*, 2023 WL 6364358, at *5–6; *Jonathan W.*, 2023 WL 5748363, at *3–6 ("But other than stating that she understood how SkillTRAN works and that she found it reliable, the VE offered no insight into how she utilized SkillTRAN, and the other sources she relied on, to calculate her job numbers.").

In addition, *Wilhelm* is distinguishable (as Claimant correctly argues) because the VE in that case adjusted the SkillTRAN estimates based on his professional experience. [ECF No. 26] at 2; *Wilhelm*, 2017 WL 5248285, at *7. Here, the VE testified that she relied on her professional experience to conclude there would be no competitive work available to someone with the hypothetical limitations posed by the ALJ who was off task more than 15% of the day or absent more than two days per month. (R.79). The VE did not, however, testify that she applied her own experience in considering the SKillTRAN estimates (at least, it is not evident to the Court from

the transcript if or how the expert may have done so) and the expert testified that she did not make any adjustments to SKillTRAN's estimates. (R.82, 89-90).

Some decisions suggest that an expert's reliance on SkillTRAN job estimates without any adjustments could satisfy the substantial evidence standard, particularly where other experts in the field find such an approach reliable. *See Kelly C. v. Kijakazi*, 2022 WL 17369592, at *8 (N.D. Ind. Dec. 2, 2022) (substantial evidence supported ALJ's reliance on vocational expert's job estimates where expert generally explained SkillTRAN's methodology, offered to recite a summary of that methodology, and testified "every vocational expert that she knows relies upon Job Browser Pro"). This approach, however, has not been adopted by the Seventh Circuit, which has not endorsed an expert's use of SkillTRAN job estimates, standing alone, as a *per se* reliable methodology. *See Case*, 2023 WL 4882880, at *3–4 ("A vocational expert can buttress estimates from survey data with his own observations and experience placing people in jobs to provide a 'reasoned and principled explanation.'") (internal citations omitted); *Wegerer v. Kijakazi*, 2023 WL 6307407, at *3–5 (W.D. Wis. Sept. 28, 2023) ("Neither the Seventh Circuit nor this court has found as a matter of law that Job Browser Pro employs reliable methods. Instead, this court has held that when a vocational expert relies on numbers derived from Job Browser Pro, 'the VE needs to be able to explain how Job Browser Pro makes its job number estimates, how she used the software to generate her own estimates, and why she believes those estimates are reliable.'") (citing *Staples*, 2023 WL 2753855, at *5); *Tipsord*, 2023 WL 6276489, at *5–7 (noting in *Case*, "the Seventh Circuit held that the ALJ was entitled

to conclude that both the VE's use of SkillTran and his professional experience produced reliable job number estimates").

For this reason, the Court agrees with the many decisions in which courts consider additional indicia of reliability, such as the VE's reconciling or adjusting SkillTRAN estimates based on the expert's own professional experience, before concluding an expert's methodology is supported by substantial evidence. *See*, *e.g.*, *Case*, 2023 WL 4882880, at *3–4; *Wegerer*, 2023 WL 6307407, at *3–5; *Tipsord*, 2023 WL 6276489, at *5–7; *Wilhelm*, 2017 WL 5248285, at *7; *see also Michelle S.*, 2022 WL 4551967, at *6 (Gilbert, J.) (VE's methodology supported by substantial evidence where VE further reduced job estimate numbers obtained from comparison with SkillTRAN OccuBrowse software based on her professional experience and particular limitations in RFC hypothetical).

The Commissioner also asserts the VE explained SkillTRAN is reliable because it "was constantly revising its numbers based on information provided by individuals within the vocational field." [ECF No. 25] at 7. The VE testified SkillTRAN considers "user input" and, in somewhat unclear language, that "SkillTRAN's constantly revising individuals within the vocational field are inputting them with their information on jobs to be looking at. . ." (R.91). This testimony is awkwardly phrased, at best, and it is unclear what it means. The VE appears to be paraphrasing information available on the SkillTRAN website with respect to the source of some of SkillTRAN's data.[7] The Court does not find it supports the

---

[7] The VE's testimony about "user input" appears to refer to the VE's recited SkillTRAN website description that the software's "template is immediately responsive to user input for

Commissioner's broader characterization of the VE's description of the merits of SkillTRAN's program. Further, the Commissioner does not provide any other evidence to support the claim that SkillTRAN is regularly updated with information from experts in the field, nor does the Commissioner explain which "numbers" within SkillTRAN are being revised, based on what information, or who is providing the information that is purportedly being used for such revisions. The ALJ also did not question the VE about her unclear testimony regarding SkillTRAN's reliability. For these reasons, and others discussed above, the Court cannot find the ALJ's decision to credit the VE's testimony in Claimant's case is supported by substantial evidence.

The Court acknowledges whether an expert's reliance on SkillTRAN job estimates is sufficiently reliable to satisfy the substantial evidence standard can be "a close question." *See Wegerer*, 2023 WL 6307407, at *3–5 (noting "[t]estimony from [VE] indicating that she brought her own experience to bear in assessing the reliability of the Job Browser Pro estimates would have gone a long way towards supporting the ALJ's step-five finding" but "the court does not find that omission fatal" where VE's experience and qualifications were unchallenged, she testified "she used Job Browser Pro on a regular basis, that she understood its methodology and the sources on which it relied, and that it was widely used by others in her field," and claimant had not raised a "pointed challenge to [the VE's] testimony at the

---

national, state, sub-state full-time and/or part-time employment estimates." (R.87; *see also* R.89). The VE similarly testified that when she uses SkillTRAN, she selects "full-time . . .as opposed to part-time." (R.84). It is not clear to the Court that this testimony, which appears to suggest only that SkillTRAN's data is constantly updated in some way and that the VE limited her search criteria to full-time positions, necessarily supports the reliability of SkillTRAN's methodology in any broader or meaningful sense.

administrative level). In this case, however, the VE's testimony did not "cogently and thoroughly" explain her methodology of relying exclusively on SkillTRAN's job estimates after direct challenge by Claimant (R.89-90). *Biestek*, 139 S. Ct. at 1155; *see also Wegerer*, 2023 WL 6307407, at *3 (claimant's "failure to present the ALJ with any critique of the VE's methodology or competing evidence does not leave him in a strong position to argue that the ALJ should have demanded more").

Accordingly, remand is required because the Court cannot determine whether the vocational expert's methodology, as articulated in the record, provided substantial evidence for the ALJ's determination that significant potential jobs exist for Claimant. The Court is not making a finding as to whether or not there are jobs available in sufficient numbers, but is remanding so that the basis for the vocational expert's job estimates can be explored more thoroughly and the ALJ can consider additional evidence on this issue if necessary.

The Court expresses no opinion on Claimant's remaining arguments (including as to Claimant's other post-hearing arguments about claimed discrepancies between the vocational expert's testimony and SkillTRAN's estimates, and the ALJ's consideration of Claimant's subjective symptoms), or the decision to be made on remand. Claimant's counsel "should raise all issues argued on appeal with the ALJ on remand" both in a pre-hearing brief and at the administrative hearing to avoid any waiver if the case is again appealed to this Court. *See Thomas H. v. Kijakazi*, 2023 WL 6388145, at *4 (N.D. Ill. Sept. 29, 2023)

## CONCLUSION

Accordingly, for all the reasons set forth above, Claimant's motion to reverse or remand the Decision of the Commissioner of Social Security [ECF Nos. 17, 19] is granted, and the Commissioner's Motion for Summary Judgment [ECF No. 25] is denied. This matter is remanded to the Social Security Administration for proceedings consistent with this Memorandum Opinion and Order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: January 29, 2024